UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

CENTRAL TRANSPORT, LLC, and CROWN )
ENTERPRISES, INC.,                 )
                                   )
            Plaintiffs,            )
                                   )        No. 3:18-CV-80-TWP-DCP
v.                                 )
                                   )
THERMOFLUID TECHNOLOGIES, INC.,    )
                                   )
            Defendant.             )

## MEMORANDUM AND ORDER

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and Standing Order 13-02.

Now before the Court is Defendant's Motion to Preclude the Testimony of Timothy Wilhelm [Doc. 45], Defendant's Motion to Preclude the Testimony of Brooks Rugemer [Doc. 47], and Plaintiffs' Motion to Recover Expert Fees Related to Plaintiffs' Experts' Deposition Testimony [Doc. 60]. The parties appeared before the Court on August 27, 2019, for a motion hearing. Attorneys Trevor Sharp and Jackson Tidwell appeared on behalf of Plaintiffs. Attorney David Draper appeared on behalf of Defendant. No testimony from Plaintiffs' expert witnesses was presented. Accordingly, for the reasons set forth below, the Court **DENIES** Defendant's Motion [**Doc. 45**], **GRANTS** Defendant's Motion [**Doc. 47**], and **GRANTS IN PART** Plaintiffs' Motion [**Doc. 60**].

## I.     BACKGROUND

The Court will first begin with the allegations in the Complaint and then turn to the challenged opinions.

1

## A.      Complaint

This case concerns whether a fire in Plaintiffs' building on March 1, 2016, was the result of Defendant's alleged improper packaging.  The Complaint states that the fire occurred at a terminal when a pallet of Valken Tactical Green Gas ("Green Gas") ignited while being loaded by a forklift.  Plaintiff Central Transport, LLC leases the terminal from Plaintiff Crown Enterprises, Inc.  [Doc. 1 at ¶ 5].  The Complaint avers that a spark at floor level occurred when the fork of the forklift struck the dock plate while loading the Green Gas.  [*Id.* at ¶ 6].  A massive fire quickly ensued and spread through the Central Transport trailer and warehouse facility.  [*Id.*].

The Complaint states that under local, state, and federal law, Defendant owed Plaintiffs a duty to exercise reasonable care in the packaging, supervision of packaging and handling, and inspection of the Green Gas to ensure that it was safe for shipment.  [*Id.* at ¶ 7].  The Complaint states that the proximate cause of the fire and resulting damage was the result of Defendant's negligent acts, more specifically pled as follows:

> (1) Failure to adequately and safely package the Green Gas;
>
> (2) Failure to inspect the pallet of Green Gas to ensure that it was safe for shipment;
>
> (3) Failure to adequately warn of the ineffective and defective packaging of the Green Gas;
>
> (4) Failure to supervise its employees responsible for packaging and shipping the flammable Green Gas;
>
> (5) Failure to implement appropriate quality controls so as to prevent damaged or defective shipment from leaving its custody and control;
>
> (6) Failure to properly handle and/or exercise due care in handling Green Gas during packaging; and
>
> (7) Failure to properly stack the pallets of Green Gas in a manner so as to prevent damage to the containers.

[*Id.* at ¶ 8].

## B.     Experts' Opinions

Relevant to the instant matter, Plaintiffs retained Timothy Wilhelm and Brooks Rugemer to testify as experts in this case.  The Court will now turn to the experts' opinions and testimony.

### 1.     Timothy Wilhelm

Timothy Wilhelm ("Wilhelm") is a fire and explosion investigator.  [Doc. 54-1 at 1]. Wilhelm was retained to determine the cause and origin of the fire.  [*Id.*].  In his expert report, Wilhelm states that in conducting the fire investigation, he used the scientific method, the basic method of fire investigations, and a systematic approach as discussed in the 2014 edition of the National Fire Protection Association ("NFPA") 921: Guide for Fire and Explosion Investigation. [*Id.* at 4].  He makes the following findings in his report:

1.  The area of origin of the fire was in trailer #49-8068 located at dock #127;

2.  The first fuel ignited is propane based Green Gas;

3.  The ignition source is a spark created by metal to metal contact of the forklift and dock plate; and

4.  The circumstances that brought the ignition source in contact with the first fuel ignited is the inadvertent leaking of Green Gas from its container allowing it to be ignited by a spark.

[*Id.* at 9].[1]

Wilhelm testified that the operator of the electric forklift saw a spark as he was driving over the dock plate.  [Doc. 54-2 at 20].  Wilhelm's understanding is that the dock plate is a metal

---

[1] The Court will not summarize Wilhelm's professional and educational background because Defendant has not challenged his qualifications in this matter.

plate that provides a bridge to the trailer and the facility.  [*Id.* at 21].  He testified that he cannot provide a description of the metal plate, which direction the plate was pointing, or whether the plate sloped.  [*Id.*].  He does not know how high the bottom of the forklift was from the floor.  [*Id.*].  He acknowledged that he did not inspect any physical evidence from the fire.  [*Id.* at 22].  Wilhelm was told that there was nothing left to inspect and that everything was cleaned.  [*Id.* at 23].  Wilhelm stated that he has never provided testimony in connection with a forklift-related fire.  [*Id.* at 20].

Wilhelm testified that despite the lack of physical evidence, he was able to provide an opinion by discussing what happened with the forklift operator, Arthur Jefferson.  [*Id.* at 23].  He explained as follows:

> A lot of times the physical evidence in the fire gets destroyed.  It gets burned up.  And in the case of a pallet or something like that, it would be destroyed anyway.
>
> So yeah, with an eyewitness statement and the fact that there was no other electrical sources within the trailer and there were no other ignition sources within the trailer and there was no other fuel in the trailer, then I was able to form my opinion.

[*Id.*].  Wilhelm testified that he determined the origin of the fire through his interview with Jefferson.  [*Id.*]  Wilhelm explained that Jefferson crossed the dock plate in the forklift and saw a spark and then it went immediately to the pallet.  [*Id.*].  Wilhelm stated that the Green Gas was the only fuel source at the dock plate and at the bottom of the trailer.  [*Id.* at 23-24].  Wilhelm stated, "I mean I just didn't have anything else that could have been ignited.  It was an empty trailer."  [*Id.* at 24].

During his deposition, Wilhelm was also asked about his opinion that the ignition source was the spark created by metal-to-metal contact of the forklift and dock plate.  [*Id.*].  Wilhelm explained that at the time he drafted his report, he did not know what portion of the forklift came

4

into contact with the dock plate. [*Id.*]. Wilhelm stated that he based this opinion strictly on Jefferson's statement that he saw a spark when he came over the dock plate and "[k]nowing that it takes metal-to-metal to make a spark, that's what I concluded." [*Id.*]. Wilhelm testified that he did not need to examine the dock plate based on Jefferson's account and the photographs that he (Wilhelm) reviewed. [*Id.* at 24, 25]. Wilhelm testified that, based on Jefferson's account, the spark came from the forklift when Jefferson drove it over the dock plate. [*Id.* at 25]. Wilhelm stated, "We know that we had a fire. We know that we had an empty trailer with no ignition source in it. And we know that the forklift came over the dock plate, and by eyewitnesses' accounts, there was a spark and it ignited the pallet." [*Id.*].

Wilhelm also discussed his opinion that regarding the circumstances that brought the ignition source in contact with the first fuel, which Wilhelm opined was the inadvertent leaking of Green Gas. [*Id.*]. Wilhelm acknowledged that ideally, he would have examined the remnant cans from the fire scene, but no evidence had been preserved. [*Id.* at 27]. Wilhelm testified that he did not examine the forklift that was involved. [*Id.*].

Wilhelm testified that he adhered to NFPA 921 in his investigation. [*Id.* at 28]. He acknowledged that he did not perform any testing. [*Id.* at 27]. In addition, he did not perform any arc mapping. [*Id.* at 29]. With respect to the fire dynamics, Wilhelm testified that the fire started within the trailer outside the sprinklers' coverage and that there were no sprinklers inside the interior of the trailer. [*Id.* at 30]. Further, with respect to fire patterns, he explained that the photograph of the trailer (where the fire originated) showed the trailer was totally consumed and that there was fire damage on the trailer adjacent to the consumed trailer, which indicated that the origin of the fire was in the consumed trailer. [*Id.*]. He stated that the trailer to the left of the

consumed trailer showed a bit of smoke damage on it, while the trailer on the right showed no damage at all. [*Id.*].

Wilhelm testified that he is not able to determine the cause of the spark, the ultimate cause of the fire, or the cause of the ignition source. [*Id.* at 31]. He did, however, know the ignition source. [*Id.*].

### 2. Brooks Rugemer

Brooks Rugemer ("Rugemer") is a commercial transportation specialist, who investigates and analyzes commercial-transportation related accidents and incidents. [Doc. 53-1 at 1].[2] Plaintiffs state that Rugemer's ultimate conclusions from his investigation should be more appropriately tailored as follows: (1) Valken used recycled and repaired pallets; (2) Valken failed to properly package its product on a pallet, in an manner that prevented sliding and movement of the product; and, (3) Valken's decision to stack [its] product six tiers high caused or contributed to the crushing of boxes on the bottom of the pallet. [Doc. 53 at 5].[3] At the hearing, Plaintiffs stated that they intend to only rely on the opinions that are consistent with their Rule 26 disclosure—that is, Rugemer's opinions "concerning the method and manner of Defendant's

---

[2] During the hearing and in Plaintiffs' Response, they acknowledge that Rugemer's expert report went beyond the scope of what he is qualified to testify. For instance, Rugemer stated that the scope of his investigation encompassed a determination as to whether the forklift operations or Defendant's actions caused or contributed to the fire. [Doc. 53-1 at 26]. He then concludes that certain actions did or did not cause the fire. [*Id.* at 31]. Plaintiffs concede that he is not qualified to render causation opinions and have withdrawn such opinions. Thus, the Court will not address Rugemer's original opinions in detail regarding the cause of the fire. Further, at the hearing, Plaintiffs stated that they are not relying on Rugemer's opinion that there was nothing improper about Arthur Jefferson's forklift operation because the jury can listen to Jefferson's testimony and decide whether Jefferson did anything wrong.

[3] Defendant noted at the hearing that Rugemer's reference to "Valken" is incorrect. Valken is simply the product name (i.e., Valken Green Gas).

preparation for shipment of the subject Valken Green Gas involved in the fire on March 1, 2016."
[Doc. 53-1 at 1].

Rugemer testified that the only deposition he read was of Floyd Brewer ("Brewer"), Defendant's owner and president, and that he did not talk to Jefferson but reviewed Jefferson's handwritten statement and Wilhelm's interview notes of Jefferson. [Doc. 57-1 at 12]. During his deposition, Rugemer reviewed a photograph of a pallet of Green Gas to which he testified was similar to the pallet of Green Gas at issue. [*Id.* at 18].[4] The following exchange occurred:

> A. To me what I see here is the top three tiers of the pallet are leaning, that indicates to me that the stretch wrap isn't right, wasn't applied properly. The bottom left carton is already showing some crush damage or maybe pinch damage from being next to another pallet. There's a slight overhang on both sides of the pallet and –
>
> Q. Do you see an overhang on the right side of the bottom?
>
> A. From about the third tier up. So starting at first and second tiers are leaning to the right, the third tier is leaning to the right. The top three tiers are leaning to the left, so they are outside of the running lines of the pallet.

[*Id.*].

Rugemer testified that the boxes were out of vertical alignment and that such a condition could be caused by the manner of handling during transport, but it suggests that the stretch wrap used on the pallet is not tight. [*Id.*]. Rugemer believed that Defendant's owner testified that Defendant applies the stretch wrap manually. [*Id.*]. He stated that he did not need to know what particular stretch wrap material was used and what the manufacture required. [*Id.*]. He explained that he did not need to know what particular stretch wrapped was used because whatever was used,

---

[4] Specifically, Rugemer testified as to the conditions of Photo B—Brewer Exhibit 7, which is reproduced in Rugemer's expert disclosure. [Doc. 53-1 at 27].

the top tier boxers on the pallet still moved. [*Id.*]. He acknowledged that he does not know why the top tier moved. [*Id.*]. He opined that one of the reasons the top tier shifted is because of the loose stretch wrap. [*Id.* at 19]. When asked how he could determine that the stretch wrap was loose based on the photograph, Rugemer testified, "I have been doing this for decades. I have handled hundreds and hundreds of claims. I have taught warehouse people how to unitize a pallet like this. This is a common symptom of not properly applying shrink wrap." [*Id.*].[5] He continued that based on his experience, the shrink wrap was loose. [*Id.*].

Rugemer testified regarding the acceptable method of securement as follows:

> The best way to secure them onto the pallet is when you begin the stretch wrap process, is to tie off the loose end of the stretch wrap through one of the pallet openings, one of the fork openings, and that gives you somewhat of an anchor. And as you wrap, your first wrap goes around part of the pallet and the bottom case and then you overlap anywhere from half to a third and you work your way to the top.

[*Id.* at 20].

Rugemer acknowledged that he does not know the condition of the pallet at issue before it was moved. [*Id.* at 23]. During the deposition, defense counsel showed Rugemer a photograph of a palletized load of Green Gas, which is Exhibit 7 to Brewer's deposition and reproduced in Rugemer's report. [*Id.*, Doc. 53-1 at 27]. Rugemer stated that if he had received the pallet in that condition as demonstrated in Exhibit 7, he would have taken the pallet to someone who handles packaging and requested that the shrink wrap be straightened. [Doc. 57-1 at 23]. He stated that he would also want to see the bill of lading to determine if the driver noted any damage. [*Id.*]. He stated that he reviewed the bill of lading in this case and that the driver of the truck reported no

---

[5] Rugemer uses "shrink wrap" interchangeably with "stretch wrap." The Court will follow suit.

damage to the shipment. [*Id.*]. He testified that drivers are supposed to note damage on freight if the driver believes that such damages will create some hazardous issues. [*Id.*]. He stated that there is no indication that there was any damage at the time the subject pallet left Defendant's facility. [*Id.*].

During his deposition, he also reviewed a photograph (Exhibit 5) of another packaged product. [*Id.* at 24]. He testified that if the product is wrapped properly, there would be shrink wrap along the bottom of the pallet where the forklift inserts are located. [*Id.*]. He testified that on the left-hand side of the photograph of Exhibit 5, there was stretch wrap along the bottom of the pallet. [*Id.*]. He continued that he could not see in the photograph where the stretch wrapped had been tied off, but he does know where Defendant ties the starting leading edge of the stretch wrap. [*Id.*].

Rugemer testified as follows when asked how Defendant's stretch wrapping process contributed to the fire:

> By the product being able to move on the pallet, it could be placed in the condition where you get a pinch or a crush along the bottom. Like you see on page 3 of my report on the bottom left, that can either be beginning of a crush due to excessive weight or it's a pinch damage where this pallet was placed down next to another pallet and the overhang caught the pallet next to it.

[*Id.*]. He concludes that Defendant's stretch wrapping process contributed to the fire because it allowed the boxes to shift and be placed outside the running lines of the pallet. [*Id.*]. He explained:

> A.    I'm basing my opinion on the – of the photos that I have seen. I don't—
>
> Q.    Of other shipments?
>
> A.    Yes.
>
> Q.    Subsequent to this shipment?

A.     Yes.

Q.     That were in the custody of Central Transport?

A.     I assume so, yes.

Q.     You don't know whose custody they were in when these pictures were taken? For sake of time, I would represent to you they were all in Central's custody for the purpose of trying to demonstrate subsequent shipments?

A.     Okay.

Q.     Do you have any other understanding?

A.     No. Just trying to look at some of the background, it looks more like a truck and cross dock than a manufacturing plant.

[*Id.*].

Rugemer reviewed another photograph (Exhibit 12 to Brewer's deposition) and opines that any issues with stretch wrapping would not cause a can to be torn out of the box like the can in the photograph. [*Id.* at 25]. Finally, when asked about his opinion that Defendant stacked the product too high, Rugemer explains as follows: "I don't think it's unreasonable that we have one pallet with crushed damage on the bottom when there's six tiers, that you would not have other crush damage on a six-tier pallet." [*Id.* at 26]. He opines that, because he has seen photographs of subsequent shipments with crushed boxes, he believes that it is possible that the pallet at issue also contained a crushed box. [*Id.*]. He testifies that there is nothing in the industry that prohibits placing other freight on top of a hazmat pallet of freight. [*Id*. at 24].

## II.     STANDARD OF REVIEW

"Federal Rule of Evidence 702 obligates judges to ensure that any scientific testimony or evidence admitted is relevant and reliable." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137,

147 (1999) (quoting *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579, 589 (1993)).

Specifically, Rule 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert,* the Supreme Court of the United States stated that a district court, when evaluating evidence proffered under Rule 702, must act as a gatekeeper, ensuring "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589. The *Daubert* standard "attempts to strike a balance between a liberal admissibility standard for relevant evidence on the one hand and the need to exclude misleading 'junk science' on the other." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 176–77 (6th Cir. 2009).

The factors relevant in evaluating the reliability of the testimony, include: "whether a method is testable, whether it has been subjected to peer review, the rate of error associated with the methodology, and whether the method is generally accepted within the scientific community." *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 970-71 (M.D. Tenn. 2002) (citing *Daubert*, 509 U.S. at 593–94). Rule 702 inquiry as "a flexible one," and the *Daubert* factors do not constitute a definitive checklist or test. *Kumho Tire Co.*, 526 U.S. at 138-39 (citing *Daubert*, 509 U.S. at 593);

*see also Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 152 (3d Cir. 1999) (explaining that these factors "are simply useful signposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted").

"Although *Daubert* centered around the admissibility of scientific expert opinions, the trial court's gatekeeping function applies to all expert testimony, including that based upon specialized or technical, as opposed to scientific, knowledge." *Rose v. Sevier Cty., Tenn.*, No. 3:08-CV-25, 2012 WL 6140991, at *4 (E.D. Tenn. Dec. 11, 2012) (citing *Kumho Tire Co.*, 526 U.S. at 138-39). "[A] party must show, by a 'preponderance of proof,' that the witness will testify in a manner that will ultimately assist the trier of fact in understanding and resolving the factual issues involved in the case." *Coffey*, 187 F. Supp. 2d at 70-71 (quoting *Daubert*, 509 U.S. at 593-94). The party offering the expert has the burden of proving admissibility. *Daubert,* 509 U.S. at 592 n. 10.

Moreover, the Supreme Court has explained that in determining "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact," the court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and whether it can properly be applied to the facts in issue." *Id.* at 592–93. "Furthermore, the court must examine the expert's conclusions in order to determine whether they can reliably follow from the facts known to the expert and the methodology used." *In re Diet Drugs*, No. MDL 1203, 2001 WL 454586, at *7 (E.D. Pa. Feb. 1, 2001) (citing *Heller,* 167 F.3d at 153).

Further, a court should "exclude proffered expert testimony if the subject of the testimony lies outside the witness's area of expertise." *In re Diet Drugs*, 2001 WL 454586, at *7 (quoting 4 Weinstein's Fed. Evid. § 702.06[1], at 702–52 (2000)). This simply means that "a party cannot qualify as an expert generally by showing that the expert has specialized knowledge or training which would qualify him or her to opine on some other issue." *Id.* (other citations omitted).

Finally, "the court will not exclude expert testimony merely because the factual bases for an expert's opinion are weak." *Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 729 (6th Cir. 2012) (quotation marks and citations omitted). Exclusion is the exception, not the rule, and "the gatekeeping function established by *Daubert* was never 'intended to serve as a replacement for the adversary system.'" *Daniels v. Erie Ins. Group*, 291 F. Supp. 3d 835, 840 (M.D. Tenn. Dec. 4, 2017) (quoting *Rose v. Matrixx Initiatives, Inc.*, No. 07–2404–JPM/tmp, 2009 WL 902311, at *7 (W.D. Tenn. March 31, 2009)) (other quotations omitted). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596. Rule 702 does not "require anything approaching absolute certainty." *Daniels*, 291 F. Supp. 3d at 840 (quoting *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671–72 (6th Cir. 2010)).

## III.     ANALYSIS

Guided by the foregoing, the Court will turn to the present Motions. Defendant raises various challenges with regard to each expert, and these will be addressed in turn as to each expert. Lastly, the Court will address Plaintiffs' Motion to Compel.

### A.     Timothy Wilhelm

As an initial matter, in Defendant's opening brief, it argues that Wilhelm's opinions are not relevant. Specifically, Defendant argues that in a products liability action, a plaintiff must establish general and specific causation and that expert testimony is required to establish cause. Defendant states that Wilhelm admitted that he is not able to determine the ultimate cause of the fire and what caused the spark that ignited the Green Gas.

Plaintiffs clarified, however, that the lawsuit is not a products liability case. Plaintiffs state that they do not take issue with the metal cannisters used by Defendant to package the Green Gas

for retail sale, but rather, they call into question the method and manner of Defendant's stacking, wrapping, and placing a significant number of boxes holding the cannisters onto a subpar pallet for shipment. Plaintiffs state that not knowing the precise cause of the spark is not synonymous with not knowing the cause of the fire. Accordingly, given Plaintiffs' representation, the Court does not need to address Defendant's argument regarding general and specific causation.

Defendant also challenges Wilhelm's methodology and asserts that he relied on insufficient facts and data. Defendant argues that he relied on a two-page investigation report by the Dallas Fire Department, a material safety data sheet for Green Gas, Jefferson's handwritten statement, and the five-to-ten-minute interview with Jefferson. Defendant argues that Wilhelm reached his conclusions without questioning or verifying the data and without conducting any tests to confirm his conclusions.

The Court finds Defendant's criticism of Wilhelm's opinions more appropriate for cross examination and not a basis for exclusion. The Court finds this case similar to the circumstances in *Hartley v. St. Paul Fire Marine Ins., Co.,* 118 F. App'x 914 (6th Cir. 2004). In *Hartley*, two eyewitnesses were awakened by an explosion at a marina. *Id.* at 916. They saw three vessels on fire—the interior of the center boat was on fire, while the exterior hulls of the boats on either side were on fire. *Id.* After the fires were put out, investigators began investigating the center boat as the origin of the fire based on the eyewitnesses' account. *Id.* The owner of the boat employed three space heaters, and he testified that his practice was to unplug all appliances, although he could not specifically recall unplugging the space heater that morning. *Id.* at 17. The experts retained in the case developed different conclusions as to the origin and cause of the fire: the expert for the insurance company concluded that the fire originated on the center boat and was caused by a spacer heater, other experts could not determine the cause of the fire from the available evidence,

and the experts retained by the boat owner testified that the fire originated from the boat next to the center boat but could not determine the cause. The district court relied on the insurance company's expert opinion and found the boat owner negligent when he left the space heater on, which caused the fire. *Id.*

The Sixth Circuit affirmed the district court's decision, finding that the court did not err when relying on the expert. *Id.* at 919. The Sixth Circuit explained, "Given that, [b]y the very nature of a fire, its cause must often be proven through a combination of common sense, circumstantial evidence, and expert testimony[,]" the reliance on expert testimony to support a common sense inference is not clearly erroneous." *Id.* at 919 (quoting *Minerals & Chems. Philipp Corp. v. S.S. Nat'l Trader,* 445 F.2d 831, 832 (2d Cir. 1971)). In determining that the expert's opinion was admissible, the Court explained:

> The inability to eliminate other causes of the fire or state with certainty the source of the accelerant go to the reliability of this conclusions, not to the admissibility of his opinion. . . . [T]he fact the other causes are not eliminated or a precise cause is not stated go the accuracy of the conclusion, not the soundness of the methodology.

*Id.* at 920.

Similarly, Wilhelm based his opinion on his interview with Jefferson, Jefferson's written statement (the only direct evidence of the incident available), the Green Gas safety data sheet, and the Dallas Fire Department's report, and he applied his knowledge acquired from his training and experience. Specifically, Jefferson testified that he was loading the Green Gas, which happens to be a highly flammable product. Jefferson testified that he saw a spark at ground level, although no one can state with certainty how the spark originated. Jefferson, however, testified that the Green Gas immediately caught fire. No party disputes where the fire originated, which was in the trailer containing the highly flammable product. Wilhelm relied on his knowledge and his

investigation to make his conclusions. The fact that Wilhelm acknowledged in his deposition that he could not opine on the specific cause of the spark does not render his opinions excludable. *See generally AmGuard Ins. Co. v. Fire Sys. of Michigan, Inc.*, No. 18-11952, 2019 WL 3456809, at *4 (E.D. Mich. July 31, 2019), *reconsideration denied*, No. 18-11952, 2019 WL 4876453 (E.D. Mich. Aug. 20, 2019) ("In the context of fire investigation cases, an expert's failure to disprove the existence of alternative ignition sources or causes for the fire may impact the weight of an expert's testimony, but it does not make an expert's opinion inherently unreliable.")

As mentioned above, Defendant argues that Wilhelm failed to rely on sufficient facts and data, but Defendant's criticisms are for cross examination. *See Andler,* 670 F.3d at 729 ("[T]he court will not exclude expert testimony merely because the factual bases for an expert's opinions are weak."); *Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility . . . . Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded."). Further, there is nothing in the record to suggest that the information from Jefferson, the driver of the forklift, was inaccurate or speculative. Thus, Wilhelm's opinion rests on factual support, which Defendant may question at the trial. As courts have explained, "An expert's opinion must be supported by 'more than subjective belief and unsupported speculation' and should be supported by 'good grounds,' based on what is known." *Pomella v. Regency Coach Lines, Ltd.*, 899 F. Supp. 335, 342 (E.D. Mich. 1995) (quoting *Daubert*, 509 U.S. at 590). Wilhelm's opinion meets this standard, and the Court finds that any "weaknesses in the factual basis" go to the weight of the opinion. *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993) (explaining that "weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility").

Defendant also challenges Wilhelm's opinions because he did not perform any testing or read any peer review literature relating to forklift fires to confirm his conclusions. The factors outlined in *Daubert*, however, are not a definitive checklist. Moreover, several courts have explained that the failure to test is not an automatic bar to providing expert testimony. *Clark v. Chrysler Corp.*, 310 F.3d 461, 467 (6th Cir. 2002) ("*Daubert* does not require an expert to come in and actually perform tests in any given situation"); *AmGuard Ins. Co. v. Fire Sys. of Michigan, Inc.,* No. 18-11952, 2019 WL 3456809, at *4 (E.D. Mich. July 31, 2019) ("physical testing of a hypothesis is not a requirement for reliability"); *Travelers Indem. Co. v. Indus. Paper & Packaging Corp.,* No. CIVA302CV491, 2006 WL 1788967, at *4 (E.D. Tenn. June 27, 2006) (explaining that "expert testimony has been held to be consistent with NFPA 921 and satisfy *Daubert* without independent testing").

Further, Defendant argues that Wilhelm relied on an outdated version of NFPA 921. Specifically, Defendant states that Wilhelm relied on the 2014 version instead of the 2017 version. Defendant argues that Wilhelm's reliance on an outdated version of the NFPA 921 should result in the exclusion of his opinion because the 2014 version requires testing of only a single hypothesis instead of multiple hypothesis. While Defendant's argument has force, Defendant may cross examine Wilhelm on this issue. *See AmGuard Ins. Co.*, 2019 WL 3456809, at *4 ("NFPA 921 does not mandate strict compliance with its provisions, including adherence to the scientific method") (citing *Alford v. Allstate Ins. Co*., No. 12-CV-14238, 2013 WL 12181846, at *3 (E.D. Mich. July 8, 2013)) ("NFPA 921 itself states, it is merely a guide for investigators, and it includes only nonmandatory provisions."); *see also Thompson v. State Farm Fire & Cas. Co.*, 548 F. Supp. 2d 588, 592 (W.D. Tenn. 2008) ("Although following NFPA 921 indicates the reliability of an investigator's methods, any departure from the document's guidelines is not necessarily in and of

itself grounds for automatic disqualification."). As recognized in *Thompson*, "[T]he purpose of NFPA 921 is to establish guidelines and recommendations." *Id.* Defendant may cross examine Wilhelm on his reliance on the 2014 version.

Finally, the Court has reviewed Wilhelm's expert report, wherein he explains that Jefferson was loading a pallet of Green Gas and that the Material Safety Data Sheet for Green Gas shows that the main component is propane. [Doc. 53-1 at 6]. Wilhelm explains that propane is an extremely flammable gas that has a relative vapor density of 1.52, which makes it 1.5 times heavier than air. [*Id.*]. Wilhelm states that any leaking of the gas would allow it to accumulate at floor level. [*Id.*]. Further, Wilhelm considered other fuel sources, but they were ruled out. [*Id.*]. He explains that Plaintiffs' forklifts are electric, so there is no viable fuel source that is easily ignitable and consistent with the fire. [*Id.*].[6] Wilhelm stated that he also discussed with Jefferson the use of electric lighting in the trailer, but Jefferson stated that there were no lights being utilized. [*Id.*].

The Court finds that Wilhelm's utilization of deductive reasoning, in combination with his knowledge, and investigation into the circumstances of the fire satisfy the *Daubert* standard. *See Walter v. Auto-Owners Mut. Ins. Co.,* No. 3:15-CV-535-TAV-DCP, 2018 WL 3650284, at *16 (E.D. Tenn. Aug. 1, 2018) (relying on the NFPA 921 in finding that the "principle of deductive reasoning, in which the investigator compares the hypothesis to all known facts as well as the body of scientific knowledge associated with the phenomenal relevant to the specific incident" constitutes permissible expert opinion) (other citations omitted). Defendant may challenge the degree of credibility the jury ought to accord Wilhelm's opinions by presenting counter evidence

---

[6] Defendant disputes the fact that all Plaintiffs' forklifts are electric. While the statement (i.e., that all Plaintiffs' forklifts are electric) may not be accurate, there does not appear to be a dispute that the forklift Jefferson was operating was an electric forklift. *See* [Doc. 57-2 at 41] (Jefferson testifying that the forklift involved in the incident was an electric forklift).

to refute their veracity. Accordingly, the Court finds Defendant's arguments concerning Wilhelm's expert opinion not well taken.

### B. Brooks Rugemer

As an initial matter, the Court notes that Defendant originally moved to exclude Rugemer's opinion because he went beyond the scope of his qualifications when he opined that certain actions did or did not contribute to the fire. The Court agrees that such testimony was beyond the scope of his qualifications, and Plaintiffs have conceded as much in their response. Further, at the hearing, Plaintiffs stated that they will not offer Rugemer's first opinion, i.e., there was nothing improper about Jefferson's forklift operation, because the jury can easily decide whether Jefferson did anything wrong. Thus, the following opinions remain: (1) Valken used recycled and repaired pallets; (2) Valken failed to properly package its product on a pallet, in an manner that prevented sliding and movement of the product; and (3) Valken's decision to stack its product six tiers high caused or contributed to the crushing of boxes on the bottom of the pallet.

Defendant argues that Rugemer's purported conclusions regarding Defendant's packaging procedures lack credibility, reliability, and validation. Defendant explains that Rugemer failed to interview Jefferson or review any tangible evidence from the scene. Further, Defendant argues that Rugemer acknowledged that he does not have any information about the pallet before it was moved by Jefferson. Defendant states that the only information Rugemer relied on was a photograph of a pallet of Green Gas shipped by Defendant after the fire. Defendant complains that Rugemer opines that the recycled pallets somehow contributed to the fire, but he also admitted that is not uncommon in the shipment industry to use such pallets. Defendant states that Rugemer failed to consider Jefferson's testimony that there was no damage to the pallet in question prior to loading. Finally, Defendant states that Rugemer blamed the shrink wrap for the product shifting

out of vertical alignment, but he never examined the actual shrink wrap used, and he incorrectly believed that Defendant applied the shrink manually.

The Court has considered Rugemer's tailored opinions, but the Court finds that they are not helpful to the jury in this case and are unreliable. *See* Fed. R. Evid. 702 (explaining that the expert's specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue). As outlined above, Plaintiffs allege in this case that Defendant did not properly package and secure the Green Gas on the pallet to ensure it was safe for shipment. Thus, one question in this case—or, the primary question in this case—is whether Defendant's method for packaging the product is adequate. Plaintiffs offer Rugemer's opinion to conclude that it was not.

Rugemer arrived at his conclusions by reviewing several photographs (he cites three in his expert report). It is unclear to the Court, however, whether the photographs were taken before the product left Defendant's facility or when the product was in Plaintiffs' possession. In this case, this is key. Plaintiffs allege that Defendant improperly packaged the product for shipment, but Defendant claims that Plaintiffs mishandled the palletized product. Thus, testimony regarding the condition of a pallet, representative of a pallet when in Defendant's possession, would have been helpful.

For instance, the Court finds the Sixth Circuit's decision in *Rose v. Truck Centers*, 388 F. App'x 528 (6th Cir. 2010) instructive. *Rose* was a products liability case, wherein plaintiffs were involved in a traffic accident, and they alleged that their truck's steering "gave out." *Id.* at 530. Plaintiffs' expert opined that the cause of the accident was the loss of power steering fluid due to the loose valve housing bolts. *Id.* at 530. The district court excluded the expert's opinion, in part, as unreliable. *Id.*

The Sixth Circuit affirmed the district court's determination that the expert's opinion was unreliable. *Id.* at 535-36. The Court explained that plaintiffs' expert inspected the steering gear at plaintiffs' home sixth months after the accident. *Id.* at 535. He also obtained an exemplar of defendant's re-manufactured steering gear and loosened the valve housing bolts to the same degree as plaintiffs' steering gear. *Id.* at 535. The problem, as the Court noted, was that the expert's "conclusions in his report are based on the assumption that on the day he inspected the steering gear, the bolts were at the precise degree of looseness that they were at the time of the accident." *Id.* The Court explained that a photograph of the steering gear taken in July 2006 indicates that the position of the bolts was altered between the time of the accident and the expert's examination. *Id.* The Court reasoned that "where, as in this case, evidence has been altered, such evidence cannot reliably support the expert's conclusion." *Id.* at 535-36. The Court further explained as follows:

> [The expert] testified that based on the photograph, he had no way of knowing whether the bolts were in the same position when he inspected them as they were at the time of the accident. [The expert] also acknowledged that his opinion that the alleged defective steering gear caused Plaintiffs' accident was based on his assumption that the bolts had the same degree of tightness that they had at the time of the accident. [The expert] further stated that at the time of his inspection, he was unaware that the positions of the bolts when he inspected them differed from their position at the time of the accident. Consequently, because [the expert's] assumption regarding the degree of tightness of the bolts on the steering gear is not only unsupported, but contradicted by evidence in the record, his conclusions regarding the steering gear's alleged defect and the causation of the accident are unreliable.

*Id.* at 536. Ultimately, the Court concluded that "by excluding the expert's testimony, the district court properly exercised its gatekeeping function under *Daubert* and *Kumho*." *Id.*

Similarly, in the instant matter, Rugemer's opinions suffer from the same deficiency. *See Rose*, 388 F. App'x at 535 ("Expert testimony may not be based on mere speculation, and assumptions must be supported by evidence in the record.") (internal citations omitted). The Court notes that in Rugemer's report [Doc. 53-1 at 31] he relies on three photographs: Exhibits 5, 7, and 8 of Brewer's deposition.[7] Defendant showed the undersigned Exhibit 8 during the hearing, and Exhibit 8 is a photograph of the palletized load while in Plaintiffs' custody—but, it is not representative of a pallet when in Defendant's possession. *See* [Doc. 59-1 at 25-26]. In his deposition, Brewer specifically took issue with Exhibit 8 being representative of a "typical palletized load," answering questions about Exhibit 8 as follows:

> Q.      Okay. Is this another example of a typical palletized load from your company?
>
> A.      This would not be typical, no.
>
> Q.      What's not typical about it?
>
> A.      It looks like most of the shrink-wrap has been torn off and there is no cardboard top on the top.
>
> Q.      Okay. But if you had the shrink-wrap on it, would it be typical of a palletized load from your company?
>
> A.      It has the cardboard layers in between, except for the cardboard on the top, six high.
>
> Q.      Isn't this shrink-wrap that I'm seeing right here, all the way down? See the little light color, doesn't that appear to be shrink-wrap?
>
> A.      Yes, but there is very little here. It looks like it almost – it's almost like somebody did this by hand. It doesn't look like a machine did that.

[*Id.*].

---

[7] Only Exhibit 5 was filed as part of Brewer's Deposition. [Doc. 59-1 at 51]. Exhibits 7 and 8 can be found in the Record at [Doc. 53-1 at 27] and [Doc. 53-1 at 10], respectively.

With respect to Exhibit 7, this is a photograph of a shipment that was taken on February 26, 2016.  Similar to Exhibit 8, Brewer does not agree that Exhibit 7 represents a typical palletized load prepared by Defendant.    In responding to questions about Exhibit 7, Brewer states as follows:

A.    No.  We have never had a problem shipping in 20 years doing it this way.
        Plus, this looks to be a different type of shrink-wrap that what we use.
        This looks like a blown shrink-wrap…

Q.    So is this something that would have been palletized - -

A.    Look at our shrink-wrap and look at that shrink-wrap.

Q.    Okay.  Are you suggesting that somebody else shrink-wrapped this?

A.    I think that was probably reshrink-wrapped by Central Transport.

Q.    We are talking about Exhibit 7, for the record, by the way.  So you think
        this was shrink-wrapped by the carrier?

A.    It looks like it's not our shrink-warp.  We don't use that type of shrink-
        wrap.

[*Id.* at 22-23].  Further, in his deposition, Rugemer referred to Exhibit 7 and noted that he based his opinions on the photographs that he had seen and that he assumed the photographs that he relied on were taken while the pallets were in Plaintiffs' custody.  [Doc. 57-1 at 24].[8]

This leaves Exhibit 5 that is referenced in Rugemer's report.  At the hearing, Plaintiffs argued that Brewer testified in his deposition that the photograph marked as Exhibit 5 was representative of Defendant's typical palletized load.  Rugemer's testimony, however, regarding Exhibit 5 does not support his conclusion that Defendant's method for packaging the product is inadequate.  The Court notes that the two main points that Rugemer makes about the shrink wrap is that it must be anchored to the pallet and it must be wrapped around the bottom of the pallet for

_____

[8] Defense counsel noted during the deposition, "I would represent to you they were all in Central's custody because they were taken by Central for the purpose of trying to demonstrate subsequent shipments."  [Doc. 57-1 at 24].

a secure shipment. When questioned about Exhibit 5, Rugemer admitted that the stretch wrap was wrapped around the bottom of the pallet. [Doc. 57-1 at 24]. With respect to whether it was anchored, he could not see from the photograph where the stretch wrap was tied and acknowledged that he does not know whether Defendant ties the starting leading edge of the stretch wrap to the product. [*Id.*]. Thus, by Rugemer's own admission, the stretch wrap on the bottom of the pallet was proper in the representative photograph and he did not know if the stretch wrap was properly anchored in the representative photograph.

Further, the Court finds other problems with Rugemer's opinions. First, he concludes that Defendant uses recycled pallets. Defendant's owner testified that Defendant uses recycled pallets to ship the product. Rugemer does not explain in his report or his deposition testimony how using a recycled pallet would ultimately damage or crush the boxes on the pallet. Instead, it appears his statements regarding the recycled pallet support his opinion that the forklift struck a nail protruding from a recycled pallet causing the spark, but he is not qualified to render this opinion.

Further, he opines that Defendant failed to properly package its product to prevent sliding and movement. Again, he blames the sliding and movement on the loose shrink wrap. The problem with this opinion, other than the above, is that he did not review or investigate Defendant's methods on packaging. He acknowledged that he did not know the type of shrink wrap applied, the thickness of the shrink wrap, or the manufacturer's specifications for the shrink wrap. He testified that none of this was relevant because the boxes moved, which could mean that the shrink wrap was loose. He did not know, however, how Defendant actually applied the shrink wrap. He testified during his deposition that he believed Defendant manually applied the shrink wrap. This is not accurate. Defendant's owner testified that it uses a machine to apply the shrink wrap. [Doc. 59-1 at 14-15].

Finally, he opines that Defendant's decision to stack the boxes six tiers high caused or contributed to the crushing of the boxes at the bottom of the pallet. In support of his opinion, he reviewed photographs of the packaged product. He explains that the boxes on the bottom tier are supporting 100 upper cases weighing ½ ton, and in his deposition, he noted that the bill of lading shows that the pallet was two hundred pounds over the weight limit. The Court finds that such testimony is not helpful because the jury may review the photograph and come to the same conclusion. Stated in a different way, the Court finds Rugemer's opinion is not based on specialized knowledge. He simply reviews photographs and opines that the boxes are stacked too high but does not explain what supports his opinion—other than crushed boxes, which the jury can see. Further, he does not explain how his experience as a cargo handler supports this opinion.[9] With respect to the weight of the load, the jury may review the bill of lading and read that the subject pallet was overweight. Accordingly, given the above, the Court finds Defendant's arguments with respect to Rugemer well taken.

### C.    Plaintiffs' Motion to Compel

Plaintiffs request [Doc. 60, as supplemented by Doc. 66] that the Court order Defendant to pay Plaintiffs' expert witnesses for their deposition testimony. Plaintiffs state that they received an invoice from Robson Forensic, which itemized the time and expense associated with Rugemer and Wilhelm preparing for and attending the depositions that Defendant subpoenaed. Plaintiffs state that they have made attempts to obtain reimbursement for these expenses to no avail. Plaintiffs argue that Federal Rule of Civil Procedure 26(b)(4)(E) imposes upon Defendant the

---

[9] The Court notes that there was very little information regarding Rugemer's qualifications on packaging product, other than his resume, which provides that he has experience with warehouse operations [Doc. 53-1]. At the hearing, the Court asked Defendant if it was challenging Rugemer's qualifications. Defendant stated that its motion raised challenges with respect to the methodology. Defense counsel stated that he will challenge Rugemer's qualifications but did not specifically argue why Rugemer was not qualified to issue his more tailored opinions.

responsibility to pay for the time spent by Plaintiffs' experts in preparing for and giving their depositions. Plaintiffs state that the itemized invoice submitted by Robson Forensics is properly based on the regular hourly rate for Rugemer's and Wilhelm's professional services and accurately accounts for the time spent by Rugemer and Wilhelm preparing for and traveling to the depositions. Plaintiffs state that even if their experts are ultimately excluded and/or summary judgment is granted, Defendant is still obligated to compensate their experts for the time they devoted for the deposition process.

Defendant states [Doc. 61] that requiring it to pay the expert fees is manifestly unjust under Rule 26(b)(4)(E) because Plaintiffs' expert witness provided no value to the litigation. Defendant cites to a number of factors that the Court should consider when assessing the reasonableness of the experts' fee and submits that other courts have not required a party to pay expert fees associated with the deposition if the expert is excluded under *Daubert*. In the alternative, Defendant asserts that Plaintiffs failed to meet their burden demonstrating that the experts' rate and fees are reasonable.

Plaintiff disagrees [Doc. 62] with Defendant's position that the experts provided no value to this case. Plaintiffs maintain that Rule 26(b)(4)(E) imposes an obligation upon Defendant to pay for the time the experts spent preparing for and giving their depositions. Plaintiffs argue that reasonableness of the hourly rates for Plaintiffs' experts is firmly established by the substantially higher rates that Defendant's own experts charge. Plaintiffs argue that Defendant chose to depose the experts in Pittsburg. Finally, Plaintiffs state that they have provided Defendant with all receipts to account for the invoices.

Both parties agree that Rule 26(b)(4)(E) governs expert fees. Specifically, Rule 26(b)(4)(E) states as follows:

> Unless manifest injustice would result, the court must require that the party seeking discovery:
>
> **(i)**      pay the expert a reasonable fee for time spent in responding to discovery under Rule 26(b)(4)(A) or (D); and
>
> **(ii)**      for discovery under (D), also pay the other party a fair portion of the fees and expenses it reasonably incurred in obtaining the expert's facts and opinions.

There are two parts to this Rule. *Ndubizu v. Drexel Univ.,* No. CIV.A. 07-3068, 2011 WL 6046816, at *1 (E.D. Pa. Nov. 16, 2011), *report and recommendation adopted,* No. CIV.A. 07-3068, 2011 WL 6058009 (E.D. Pa. Dec. 6, 2011). "First, a court should not order payment of expert fees if manifest injustice would result." *Id.* (citing Fed. R. Civ. P. 26(b)(4)(E)). "Second, a court is required to compel payment of only 'a reasonable fee.'" *Id.* (citing Fed. R. Civ. P. 26(b)(4)(E)). The Court will address Defendant's arguments separately.

First, Defendant asserts that requiring it to pay the experts' fees for preparing for and participating in depositions results in injustice because the experts did not provide any value to the litigation. The Court disagrees with Defendant's position. *Se-Kure Controls, Inc. v. Vanguard Prod. Grp., Inc.*, 873 F. Supp. 2d 939, 957 (N.D. Ill. 2012) ("A finding of manifest injustice is rare and is granted only in extreme circumstances."); *see also Ndubizu*, 2011 WL 6046816, at *4 ("The manifest injustice exception to the requirement that courts order reimbursement of expert fees is a stringent standard that applies in two instances: payment can be excused either if the deposing party is indigent or if requiring the payment would create an undue hardship.") (internal citations omitted).

In support of its position, Defendant relies on *G.C. v. S. Washington Cty. Sch. Dist. 833*, No. 17-CV-3680 (DSD/TNL), 2019 WL 586676, at *4 (D. Minn. Feb. 13, 2019). The Court finds that the facts in *G.C.* are distinguishable from the instant matter. In *G.C.,* the court concluded that

it would be a manifest injustice for defendants to pay for the costs of deposing plaintiffs' expert because the expert provided no value to this litigation. *Id.* The court explained that during the deposition, the expert was unable to recall a number of details related to the way in which he prepared his expert report and his interactions with counsel. *Id.* Further, the plaintiffs in *G.C.* admitted that given the expert's frail state and his performance at the deposition, it was no longer feasible to call him as a witness at trial. *Id.* The court was also persuaded by the fact that plaintiffs' counsel did not make any meaningful effort to communicate with the expert following the expert's heart attack. *Id.*

In the instant matter, Defendant sought and participated in these depositions and must pay the experts' fees for such depositions. "[The Rule] provides in plain language that the party seeking discovery must pay the expert a reasonable fee for time spent in responding to that discovery. It has nothing to do with prevailing parties." *El Camino Res., Ltd. v. Huntington Nat. Bank*, No. 1:07-CV-598, 2012 WL 4794589, at *1 (W.D. Mich. Sept. 18, 2012), *report and recommendation adopted,* No. 1:07-CV-598, 2012 WL 4794584 (W.D. Mich. Oct. 9, 2012). While the Court has excluded Rugemer's opinions, the Court does not find that manifest injustice would result by requiring Defendant to pay for the depositions that it took. Unlike the expert in *G.C.,* Rugemer was able to articulate the reasoning for his opinions during the deposition. The Court simply found that his methodology was unreliable and unhelpful. Accordingly, the Court finds Defendant's position not well taken.

Defendant also challenges the reasonableness of the experts' fees. It is within the Court's discretion to determine the reasonableness of an expert's fees. *Burgess v. Fischer*, 283 F.R.D. 372, 373 (S.D. Ohio 2012). In determining the appropriate fee, the Court should consider "the education and experience of the expert, the prevailing rates for similar experts, as well as the

complexity of the information sought." *Bonar v. Romano*, No. 2:08-CV-560, 2010 WL 4280691, at *1 (S.D. Ohio Oct. 25, 2010).

The Court has considered the above factors and has reviewed the challenges rates, and the Court finds such rates to be reasonable. Specifically, Rugemer charges $455 per hour, and Wilhelm charges $225 per hour. Defendant hired similar experts with much higher rates (i.e., Dr. Singh charges $750 per hour and Dr. Icove charges $400 per hour). The Court finds Rugemer's and Wilhelm's hourly rates reasonable.

Further, Defendant objects to the traveling expenses, arguing that Plaintiffs retained experts in Pennsylvania, even though the case is currently pending in the Eastern District of Tennessee. The Court finds Defendant's argument a non-starter. "Time reasonably spent traveling to and from a deposition is generally compensable under Rule 26." *El Camino Res., Ltd*, 2012 WL 4794589, at *3. While the experts do not reside in Tennessee, defense counsel chose to depose them in Pittsburg, Pennsylvania. The Court finds Defendant's argument not well taken. *See Rote v. Zel Custom Mfg. LLC,* No. 2:13-CV-1189, 2018 WL 2093619, at *4 (S.D. Ohio 2018) ("Although not universally accepted, numerous courts . . . have determined that a reasonable fee may include an expert witness's preparation and travel.") (other citations omitted).

Finally, Defendant argues the expenses for hotels and meals are excessive. Specifically, Defendant states that both expert witnesses' expenses for their hotels are unreasonable and that Rugemer's expenses associated with his meals are excessive. Defendant urges the Court to adopt the maximum per diem allowance set for federal government employees—that is, $125 for lodging and $56 for meals and incidentals.

The Court finds that Plaintiffs have not met their burden in showing that the hotel expenses and Rugemer's food expenses are reasonable. *Brunarski v. Miami Univ.*, No. 1:16-CV-311, 2017

WL 713691, at *2 (S.D. Ohio Feb. 23, 2017) ("[T]he burden of proving the reasonableness of an expert's fees lies with the party seeking reimbursement.") (other quotations omitted). Here, Wilhelm's invoice for his hotel includes $251.38 for room and tax and $26 for valet parking. [Doc. 61-1 at 3]. Rugemer's hotel invoice includes $258.17 for room and tax and $26 for valet parking. [Id. at 4]. Rugemer spent $80.77 for meals. [Doc. 62-3 at 1]. While Plaintiffs submitted the invoices to support the charges, this does not equate to a finding of reasonableness. There is nothing in the record that supports the above charges are reasonable for the area. Further, it is not clear whether valet parking was necessary. The only information that the Court has to determine whether the above charges are reasonable is the data that Defendant has supplied. Accordingly, the Court **ORDERS** as follows: (1) Defendant shall reimburse Rugemer for meals in the amount of $56, not $80.77; (2) Defendant shall reimburse both experts for hotel costs in the amount of $125; and (3) no valet charges will be permitted. Defendant shall pay all other costs based on the invoices Plaintiffs have now provided.

IV.     **CONCLUSION**

Accordingly, for the reasons set forth above, the Court **DENIES** Defendant's Motion to Preclude the Testimony of Timothy Wilhelm [**Doc. 45**], **GRANTS** Defendant's Motion to Preclude the Testimony of Brooks Rugemer [**Doc. 47**] and **GRANTS IN PART** Plaintiffs' Motion to Recover Expert Fees Related to Plaintiffs' Experts' Deposition Testimony [**Doc. 60**].

**IT IS SO ORDERED.**

ENTER:

Debra C. Poplin
Debra C. Poplin
United States Magistrate Judge